**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

HOPE ANGELIC WHITE, *et al.*     )
                                      )
                                      )
        Plaintiffs,         )
                                        )
        v.                  )         No. 4:15CV1252 SNLJ
                                        )
THE UNITED STATES OF AMERICA,  )
*et al.*,                           )
                                        )
        Defendants,     )

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff Hope Angelic White brings this action individually and in her capacity as personal representative for the Estate of her decedent, Myron Pollard, against defendants the United States of America and Bernard Hansen, an agent with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Currently pending before the Court are defendants' motions for summary judgment (#50, #52), the plaintiff's motion for sanctions (#83), and defendants' motion to exclude plaintiff's expert testimony (#54).

**I.    Factual Background**

    **A.    Facts Related to Summary Judgment**

On August 29, 2012, an undercover ATF agent met several men behind a warehouse in St. Louis, Missouri. The men were thought to have committed robberies and other crimes, including home invasions for the purpose of stealing money, drugs, or contraband. The agent posed as disgruntled drug courier who wanted to arrange for the

robbery of his drug supplier. The plan was to arrest the men before they embarked on the robbery.

Because the men were suspected to be armed and dangerous, the ATF Special Response Team ("SRT") --- the ATF's version of a SWAT team --- was asked to assist with the undercover operation. Defendant Hansen was a member of SRT 1, which was assigned to assist with this particular operation. At the pre-operation briefing, Hansen learned that the suspects told a confidential informant that they were going to rob and kill the undercover agent after the robbery.

SRT 1 arrived at the parking lot before the suspects arrived. Several members of SRT 1, including Hansen, were in the back of a U-Haul truck parked in the warehouse parking lot ready to arrest the suspects once the undercover agent confirmed that the suspects were armed and prepared to commit the fictitious robbery.

While in the back of the U-Haul, although the SRT team could not see the suspects, Hansen learned that two suspects arrived on foot and more suspects arrived in a car shortly thereafter. Hansen knew generally where the suspects would be based on a map that he saw during the briefing.

After the signal to start the arrests, Hansen was first to exit the U-Haul. He was assigned the responsibility of ascertaining the threat level being encountered by the entire team. The suspects' car was parked approximately two car lengths away from the U-Haul truck: the U-Haul was parked next to a fence, a driveway was next to the U-Haul, a white van was parked facing the wall of the warehouse next to the driveway, and the suspect's car was parked on the other side of that van, facing the wall of the warehouse. When Hansen jumped out of the back of the U-Haul, he had to turn left and then left again to face the suspects and the car. Hansen yelled "Police!" while running toward the

suspects' car with the other agents behind him. When Hansen was approximately seven yards away from the suspects' car, he saw the car's reverse lights come on. Hansen and the other agents were all behind the car, although it is unclear how close they were to the car's path. The car reversed in a semi-circle back in Hansen's general direction and then to Hansen's right. The plan had been for the SRT members to form a line along the driver's side and rear of the suspects' car in an "L-shape" to provide coverage from multiple angles. Hansen, concerned that the car would hit himself or members of the SRT, raised his rifle and aimed at where he believed the driver was sitting. Hansen moved to his left to avoid the vehicle and fired three rounds toward the driver in an effort to stop the car. Another ATF agent who had also been in the back of the U-Haul fired baton round shots from his weapon at the driver of the suspects' car. Meanwhile, a bucket truck (similar to the sort of truck used by electric companies to work on power lines) came from the other side of the parking lot and rammed into the car, disabling it. Fewer than three seconds elapsed between the time the car went into reverse and when it came to a complete stop.

Although Hansen did not know it, plaintiff's decedent, Myron Pollard, was sitting in the front passenger seat of the suspects' car. It was later determined that one of Hansen's bullets struck Pollard, who died the next day at a hospital.

Notably, plaintiff denies that the car's driver, Dametrius Creighton, was backing up toward the SRT members. However, Creighton admitted he backed the car in their direction at the hearing in which he pleaded guilty to conspiracy to commit a Hobbs Act robbery.

Plaintiff brings this action as the personal representative for Pollard's estate and also as an individual. Her remaining counts are under the Federal Tort Claims Act

("FTCA") and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Defendants have each filed a motion for summary judgment.

### B. Facts Related to Sanctions Motion

ATF Agent Jason French set up four video cameras in advance of the sting operation in order to record the events of that morning. The cameras did not record onto storage devices local to the video cameras. Instead, the cameras wirelessly transmitted the video to a server at a remote location. A copy of the videos from each camera was burned onto DVDs and then given to an ATF agent. According to the defendants, the DVDs were then put in a sealed envelope and put in an evidence room to be used in the criminal prosecutions following the sting operation.

> None of the four videos show the shooting clearly. According to plaintiff,
>
> None of the four cameras showed the actual shooting by Special Agent Hansen –two of them were obscured by other objects and two are missing the video frames at the time of the shooting. Of the two videos that are missing the video frames during the shooting, one has "frozen" or repeated digital frames although the analogue audio is not erased. The other video (a pole camera), does not have an audio file; but the video is missing between the time the car backed up (that included the shooting) and the time a ramming truck rammed into the back of the car. Over four seconds of video are missing from the pole camera.

(#56-1 at 2.) ATF Agent French explained at his deposition that he believed the "frozen" scenes in the video were caused by the wireless signal being disrupted by all the vehicles getting in between the transmitter and receiver. Plaintiff sought access to the server onto which the cameras recorded (and from which the DVDs were made).

ATF Agent Grothaus had possession of the server itself. He states in his declaration that he believe he deleted the video files from the server in early 2013 as part of routine maintenance of the server, but it is possible the files were no longer on the

4

server at that time.  Before deleting the files, Grothaus confirmed with the respective case agents that the video files were no longer needed on the server.

An ATF Investigator recovered 75 deleted files from the server.  However, the deleted files did not include any data that would allow them to be identified by a date and time recorded.  They would have to be viewed one-by-one to determine whether they were responsive, but the Investigator could not view them with her software.  So she e-mailed one small file to a colleague in another location, who was able to view the file and determine it was not responsive (it was video of an office interior and copy machine). The investigator could not email the other files because they were too large.

Plaintiff moved for sanctions against defendants pursuant to Federal Rule of Civil Procedure 37 and common law spoliation of evidence principles.  Plaintiff sought an order stating that defendants violated Rule 37(e) and common law principles of spoliation of evidence by destroying the original videos on the server.  Plaintiff seeks either a judgment against defendants or an adverse jury instruction against defendants at trial regarding the content of the deleted videos.

This Court treated plaintiff's motion as a motion to compel and ordered defendants to inspect the 75 deleted video files and produce any files that relate to this matter to the plaintiff.  (#74.) The Court stated it may entertain a renewed motion for sanctions at a later date, if appropriate.  The parties have filed supplementary memoranda.  Defendants were unable to locate any video files on the server that relate to this case.  (#75.)  Plaintiff has renewed her motion for sanctions and seeks denial of defendants' summary judgment motions (#80).

The Court has viewed the videos in question, which were submitted by defendants in connection with the recent supplementary briefing. Three of the five video files show action from the relevant time period.

**The Pole Camera:** One video --- taken from a camera mounted high on a pole --- includes a timestamp that shows that the video includes one frame every two to four seconds, with some longer gaps in between the frames. The speed at which the camera streamed footage depended on the internet connection that wireless transmitted images from the camera to the offsite server which recorded the footage. Unfortunately, the video skips from 11:25:59 to 11:26:18 to 11:26:22. At 11:25:59, the back door of the U-Haul is closed and the suspects appear to be talking to the undercover agent. At 11:26:18, the back door of the U-Haul is open, but none of the SRT members are completely outside the U-Haul yet. By 11:26:22, the car has crashed into the bucket truck, and the car is surrounded by SRT members.

**The Side Camera:** Two video cameras were mounted under a tractor-trailer that was parked in front of the U-Haul. (Inexplicably, it appears that the Court was not provided with complete video from one of the two cameras, so it is not clear what video from the other camera shows.) The video footage provided to the Court shows the camera was focused at the van parked up against the building. It is difficult to see what is going on behind the van, but the suspects clearly retreat as the ATF agents approach and then the car backs up quickly, turning to the right. There is gunfire and smoke, and the bucket truck can be seen ramming into the back of the car. It is impossible to see what is going on inside the suspects' car either before or after it is hit by the bucket truck. The

video has relatively low resolution, so although the suspects and SRT members' general movements are easy to make out, there is no fine detail. The video freezes briefly as the SRT members approach the suspects' car, but because of the angle of the camera and the recording's low-resolution format, it does not appear that any information of use was lost as a result of the frozen frame. Notably, the video freezes briefly at least one other time earlier in the recording.

**The Rear Camera:** Another video camera was mounted on the ATF surveillance vehicle in an alley to the right of the warehouse parking lot. It is zoomed in on the suspects' car at the time of the incident. The suspects may clearly be seen retreating, but then the bucket truck pulls in between the camera and the suspects' car, obscuring any useful view of the incident.

## II. Spoliation Motion

Because plaintiff seeks, *inter alia*, denial of defendants' summary judgment motion as a sanction for deletion of the original video files recorded on the server, the Court first addresses plaintiff's spoliation motion. (#78.) Rule 37(e), upon which plaintiff's motion is based in part, states as follows:

**Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Plaintiff bears the burden of showing the necessary intent and prejudice required to prove her spoliation claim. *Johnson v. Ready Mixed Concrete Co*., 424 F.3d 806, 811 (8th Cir. 2005).

Plaintiff asserts that defendants' declarants demonstrate that multiple video files recovered from the original server "were unable to be converted into a viewable format" by resources available to the ATF. (#78 ¶¶ 6, 10.) Plaintiff states she is harmed because "the erased video would tell a million words and substantiate plaintiffs' claims according to eyewitness Damitrius Creighton, plaintiffs' expert, and the physical evidence at the scene." (*Id.* ¶ 12.)

ATF Agent French testified that he downloaded the video files in their entirety from the server onto the DVDs and that no one could have altered the footage to exclude several seconds of video recording. He further testified that he believed the "frozen" frames were caused by the wireless signal being interrupted by the vehicles moving in between the transmitter and receiver. Thus, defendants argue, the video recordings on the server were identical to what was recorded onto and preserved on the DVDs. Plaintiff has put forth no evidence to suggest that the videos on the server would have shown anything different.

Furthermore, the Advisory Committee Notes on the 2015 Amendment of Rule 37(e) state that the "rule does not apply when information is lost before a duty to preserve arises." Fed. R. Civ. P. 37 advisory comm. nn. 2015 Amend. Plaintiff did not file her administrative claims with ATF until August 27, 2014, which was nearly a year after the server files were deleted. The DVD copies of the footage still existed and were preserved in the ATF field office's evidence vault. Plaintiff has not shown culpable intent to warrant the severe sanctions of a default judgment or denial of summary judgment. The Court will also decline to give plaintiff's adverse inference instruction to the jury, "that it may or must presume the information was unfavorable to the [defendants]," because, under the circumstances, the reference to a "presumption" is not supported. However, plaintiff will be permitted to argue an inference --- as opposed to a presumption --- that the missing parts of the video would have been detrimental to defendants.

## III.    Summary Judgment Motions

Pursuant to Rule 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). However, the nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). With these principles in mind, the Court turns to the discussion.

## A.     Defendant Hansen's Motion for Summary Judgment

The Court first discusses Count II of plaintiff's complaint, which brings a *Bivens* action against defendant Hansen, alleging violations of Myron Pollard's rights under the Fourth and Fifth Amendments to the United States Constitution.

### 1.     Individual capacity claim

Plaintiff's claims include a *Bivens* claim in her individual capacity. Plaintiff insists this is proper because the Missouri wrongful death statute allows the parent to sue for the death of a child, citing § 537.080.1 RSMo. The Supreme Court, however, has held that a *Bivens* claim survives the decedent's death regardless of state survivorship

laws.  *Carlson v. Green*, 446 U.S. 14, 25 (1980).  Thus, the *Bivens* action must be

brought by plaintiff as representative of the decedent's estate.

### 2. Substantive due process claim

Plaintiff includes an excessive force claim as a substantive due process claim

brought under the Fifth Amendment.  This claim must be dismissed because excessive

force "claims are properly analyzed under the Fourth Amendment's "objective

reasonableness" standard, rather than under a substantive due process standard."  *Graham*

*v. Connor*, 490 U.S. 386, 388 (1989).  Plaintiff attempts to skirt this requirement, citing to

a recent Supreme Court case in which the Court declined to determine whether Fifth

Amendment analysis could apply to a situation in which a border patrol agent shot and

killed a Mexican national standing across the border.  *See Hernandez v. Mesa*, 137 S. Ct.

2003, 2007 (2017).  But the law remains that

> *all* claims that law enforcement officers have used excessive force—deadly
> or not—in the course of an arrest, investigatory stop, or other "seizure" of a
> free citizen should be analyzed under the Fourth Amendment and its
> "reasonableness" standard, rather than under a "substantive due process"
> approach. Because the Fourth Amendment provides an explicit textual
> source of constitutional protection against this sort of physically intrusive
> governmental conduct, that Amendment, not the more generalized notion of
> "substantive due process," must be the guide for analyzing these claims.

*Graham*, 490 U.S. at 395 (emphasis in original).  The Court will grant summary

judgment to defendant on plaintiff's substantive due process claim.

### 3. Qualified immunity

Defendant argues that he is entitled to summary judgment on plaintiff's Fourth Amendment claim because he is entitled to qualified immunity. Government officials such as ATF agents are shielded from liability for their actions unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sanders v. City of Minneapolis, Minnesota*, 474 F.3d 523, 526 (8th Cir. 2007). To determine whether an official is entitled to qualified immunity, the Court must determine (1) whether the plaintiff's constitutional or statutory rights were violated and (2) whether those rights were clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Defendant contends that the proper inquiry is whether it was reasonable for Hansen to use deadly force (that is, to shoot into the car at the driver) in order to stop the car. Defendant, of course, says his use of deadly force was reasonable under the circumstances. Indeed, the Eighth Circuit has held that officers are entitled to use deadly force when a suspect drives his car in a manner that poses a threat of serious physical harm to others. *Sanders*, 474 F.3d at 526; *Hernandez v. Jarman*, 340 F.3d 617, 623 (8th Cir. 2003). In *Sanders*, for instance, the officer told the plaintiff to show his hands, but instead plaintiff backed his car into the security guard's car and then accelerated down an alley toward other officers. 474 F.3d at 526. The Court held the officer's use of deadly force against the driver was reasonable. *Id.* Similarly, in *Hernandez*, a suspect had already intentionally crashed his car into an officer's car and was driving toward another officer when that officer shot at him. 340 F.3d at 623. The

Court held that the officer's use of deadly force was objectively reasonable under the circumstances. *Id.* Here, defendant says that he knew from the pre-operation briefing that the suspects were armed and that they planned to kill the undercover agent after the robbery; when defendant yelled at the suspects to "let me see your hands," he instead saw the car's reverse lights come on and the car started to reverse in his general direction. He says he was standing directly behind the car when he fired the first shot at the driver and then he fired two more shots at the driver while running to his left. He further says he did not know the car would turn to the right to the degree that it did. Rather, he believed that he and the ATF agents blindly exiting the U-Haul behind him were likely to be hit by the car.

Although it is a close case, the Court finds that there is a question of fact as to whether defendant's actions were reasonable under the circumstances. Even though defendant had heard the suspects planned to kill the undercover agent after the robbery, this case is distinguishable from cases like *Sanders* and *Hernandez* because in those cases the suspect intentionally crashed into another vehicle first, and, in *Sanders*, the car was speeding down an alley with officers directly in its path. Here, even viewing the video footage, it is not clear that the defendant reasonably believed he and his fellow ATF agents were in imminent danger in light of the angle at which the car ultimately pulled out of its parking spot. Defendant and the other agents were not in a narrow alley, and there is evidence --- including testimony from the driver Damitrius Creighton[1] --- that the

---

[1] Damitrius Creighton was later charged, pleaded guilty, and sentenced to prison for his role in the events of that day. As part of his plea, he signed a stipulation of facts that included the

driver was not reversing toward the agents and that shots were fired <u>after</u> the vehicle had been disabled by the ramming bucket truck. Indeed, Creighton testified that shots were fired before he put the car into reverse and after the car was stopped by the bucket truck. (*E.g.*, #61-3 at 46, 94.) And then, of course, there is the issue of the missing video frames.

Further, the Court disagrees with defendant's assessment that Myron Pollard's constitutional rights were not clearly established. The question is whether "the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation and alteration omitted). The defendant relies on a Supreme Court case noting that it has "never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Mullenix v. Luna*, 136 S. Ct. 305, 310 (2015). This, however, was not a dangerous car chase *per se*, but was a situation in which the defendant officer may or may not have reasonably determined that the reversing car posed a serious threat to himself or others. There exists a genuine dispute of material fact, and the Court must deny summary judgment to defendant.

---

statement that he "backed the Grand Prix in the direction of SRT agents at a high rate of speed. Fearing for their lives, the SRT fired on the Grand Prix, killing M.P. and wounding Jones." (*See* #72 at 6.) He also testified under oath that those facts were true. Defendants contend that Creighton cannot now create a genuine issue of fact by changing his sworn testimony, citing to *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 391 (8th Cir. 2010). But that case stands for the proposition that a *party* cannot change its testimony in order to create an issue of fact. *Id.* Creighton is not a party. Although defendants suggest that allowing Creighton to testify that he lied during his plea will encourage other criminal defendants to do so, it is a criminal act to commit perjury, and the threat of a perjury charge should be adequate to dissuade criminal defendants (or anyone) from lying under oath. Creighton may testify at his own risk.

## B.    The Government's Motion for Summary Judgment

Plaintiff's Count I brings a claim against the United States pursuant to the Federal Tort Claims Act ("FTCA") alleging that defendant Hansen used excessive force when he shot and killed plaintiff's son, Myron Pollard, and that such conduct was negligent, wrongful, and/or tortious. The FTCA provides a limited waiver of sovereign immunity for "negligent or wrongful acts by federal employees committed while acting within the scope of their employment." *Washington v. Drug Enf't Admin.*, 183 F.3d 868, 873 (8th Cir. 1999). "The United States is liable to the same extent that a private person under like circumstances would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* Missouri law permits a law enforcement officer to use deadly force if he

> reasonably believes that such use of deadly force is immediately necessary to effect the arrest and also reasonably believes that the person to be arrested... may … endanger life or inflict serious physical injury unless arrested without delay.

563.046.3(2) RSMo; *Fitzgerald v. Patrick*, 927 F.2d 1037, 1038 (8th Cir. 1991).

The Missouri Supreme Court held that "'[r]easonably believe' means 'a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.'" *State v. Smith*, 456 S.W.3d 849, 852 (Mo. banc 2015) (quoting MAI-CR 3d 306.06A[6]). "A person who uses force as described in sections 563.031... [and] 563.046... is justified in using

such force and such fact shall be an absolute defense to ... civil liability." §563.074.1 RSMo.

The government says it is entitled to summary judgment because Hansen's use of deadly force was necessary to prevent serious physical injury to himself and his fellow ATF officers. However, as discussed above, the Court finds that a disputed issue of fact exists regarding Hansen's reasonable belief that serious injury or death was imminent. Summary judgment must be denied.

## IV. Motion to Exclude Expert Witnesses (#54)

Plaintiff identified two experts, Stephen Gardner and Mark Ezra, and disclosed two expert reports written by Gardner and "peer-reviewed" by Ezra. Both Gardner and Ezra are mechanical engineers who perform accident reconstruction for cases involving car accidents or claims of product malfunctions. Plaintiff seeks to introduce their testimony offering opinions about Hansen's location relative to the suspects' vehicle and whether he was in danger. Specifically, plaintiff's experts purport to opine, within a "reasonabl[e] degree of engineering certainty" that:

> 1) At no time was the movement of the subject vehicle a physical threat to law enforcement personnel;
>
> 2) The suspect vehicle did not achieve a high speed during its reversing maneuver; and
>
> 3) The extent of the damage to the rear of the suspect vehicle was the result of the velocity of the subject vehicle at impact with the police man-lift equipped truck added to the velocity at impact of the man-lift equipped truck itself. The impact energy causing the damage to the subject vehicle resulted from the kinetic energy of both vehicles at the instant of impact.

Defendants argue that the testimony should be excluded because Gardner and Ezra are not qualified to offer their opinions, and, further, their opinions are not reliable or relevant.

## A. Legal Standard

This Court must act as a "gatekeeper" to "insure that proffered expert testimony is both relevant and reliable." *Wagner v. Hesston Corp.*, 450 F.3d 756, 758 (8th Cir. 2006) (quoting *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003)); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 governs the standard for this Court's admission of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

## B. Discussion

Defendants argue that the following matters should be excluded from evidence.

> **Conclusion 1: At no time was the movement of the subject vehicle a physical threat to law enforcement personnel.**

Defendants contend that Conclusion 1 is not "an opinion within a reasonable degree of engineering certainty," but rather it presents a legal conclusion and thus does not assist the trier-of-fact. "It is well-settled that experts may not offer legal conclusions

about a case." *Morley v. Square, Inc.*, 4:10CV2243 SNLJ, 2016 WL 1728367, at *2 (E.D. Mo. Apr. 29, 2016) (citing *In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d 899, 905 (8th Cir. 2005)). Defendants argue that the conclusion that the vehicle did not pose a physical threat to anyone implicitly addresses the reasonableness of Hansen's use of deadly force because it answers the ultimate question of whether the vehicle posed a threat of serious injury. Notably, plaintiff did not address this argument in her response in opposition to defendants' motion. This Court agrees with defendants and will exclude testimony regarding Conclusion 1.

Conclusion 1 is also excluded for another reason. Defendants and plaintiff devote most of their briefing to Gardner's qualifications with respect to ballistics and bullet trajectory analysis. In the "Analysis" section of Gardner's report, he describes and provides illustrations of the "probable field of fire positioning" in an effort to show where Defendant Hansen was standing when he fired his weapon into the car. Gardner's conclusion that Hansen was not in danger at the time he shot into the car is ultimately based upon that analysis. Defendants object because they say Gardner and Ezra are not qualified to offer the analysis due to the fact that they are admittedly not ballistics experts.

First, Gardner testified that he is not a ballistics expert or an expert in bullet trajectory analysis. He has no experience, training, or education in bullet trajectory analysis. Almost all of Gardner's work as an expert witness has been within the realm of accident reconstruction where the injury at issue was caused by the accident itself. Here, in contrast, Gardner has tried to determine where defendant Hansen was located when he

shot into the suspects' vehicle based upon bullet trajectories and estimated speed and location of the car.   Defendants hired their own expert, Alexander Jason, a board-certified shooting reconstructionist, to review Gardner and Ezra's report.  The focus of Jason's work has been on crime scene analysis, shooting incident reconstruction, and would ballistics research.  Jason opined that the combination of Gardner's unfamiliarity with the science of wound ballistics and bullet performance makes Gardner's conclusions unscientific and unreliable.

Plaintiff responds that Gardner's lack of ballistics expertise is irrelevant because "no one is trying to match a bullet to a gun and to a shooter." (#63 at 2.)  Plaintiff insists that her expert needs only to be an expert in physics, engineering, and accident construction in order to show whether Hansen was in the path of the suspects' vehicle. She further states that her experts used ballistic trajectory equations commonly known to all engineers.

Defendants' expert Jason disagrees.  As a shooting reconstructionist/crime scene analyst, Jason is required to make determinations as to the sequence of events, shooting location, trajectory analysis, and bullet penetration into clothing, walls, cars, and other objects.   Further, although plaintiff states her experts are not trying to "match a gun to a shooter," that is in essence what Gardner attempts to do --- there were two guns, two types of bullets, and two shooters on this scene, and Gardner attempts to show where one of those shooters was located.  Gardner admits that he is not an expert in ballistics. Plaintiffs cite to no cases in which Gardner or Ezra have been accepted as experts on the issues of ballistics, bullet trajectory analysis, or shooting reconstruction.  Although

Gardner and Ezra may be accomplished accident reconstructionists, and they appear to be qualified to opine as to the trajectory of the suspects' vehicle when it collided with the bucket truck, the question of where a shooter was standing requires a different kind of expertise. The Court agrees that plaintiff's proffered experts do not possess the type of expertise required to satisfy the standards of Federal Rule of Evidence 702. They will not be permitted to testify as to the matter of Hansen's location or make conclusions regarding whether he was in harm's way when he fired his weapon.

### Conclusion 2: The suspect vehicle did not achieve a high speed during its reversing maneuver.

Defendants object to this testimony because it tells the factfinder what result to reach and also does not assist the trier of fact. Gardner testified that a "high rate of speed" depends on the circumstances --- e.g., whether the vehicle is in a parking lot or on the highway, and that his opinion is based on his practical experience. It is "kind of a common sense thing," Gardner testified at his deposition, further stating that "I don't even think you would need to reference an engineer. I mean, people that are experienced driving cars would probably assign similar speeds as being reasonable or not reasonable in a parking lot." (#54-1 at 190.) Gardner also stated that he is not aware of any professional publications defining what constitutes a high speed for a car travelling within a parking lot. Thus, defendants argue, Gardner's conclusion that the car did not reach a high rate of speed is his personal opinion and not based on industry practice or standard. The Court and jury are just as capable of reaching this conclusion without his testimony. The Court agrees with defendants and will prohibit this testimony.

**Conclusion 3: The extent of the damage to the rear of the suspect vehicle was the result of the velocity of the subject vehicle at impact with the police man-lift equipped truck added to the velocity at impact of the man-lift equipped truck itself. The impact energy causing the damage to the subject vehicle resulted from the kinetic energy of both vehicles at the instant of impact.**

Defendants object to this conclusion because it is not relevant to any issue in the case. Gardner's report includes the calculation that the suspects' vehicle was moving around 17.7 miles per hour at the time of the collision. Gardner explained in his deposition that he included this conclusion in his report because, if an "accident reconstructionist" looked at the suspects' damaged car and did not look at the other vehicle, he would think the car was going much faster than 17.6 miles per hour. Gardner said that the damage was extensive because the car crashed into the bucket truck which was itself moving toward the car at 10 to 12 miles per hour. Defendants argue that because they did not retain an accident reconstructionist to counter Gardner's opinion about the velocity of the suspects' car, this conclusion does not serve its purpose. Defendants do not appear to challenge Gardner's statement in his report that the car was moving around 17.6 mph at the time it hit the bucket truck. In any event, the Court finds that the "conclusion" regarding the cause of the vehicle's rear end damage is relevant to explaining why the car was damaged extensively despite Gardener's conclusion that it was traveling only around 17.6 mph. That testimony may help the trier of fact, though it seems that a 17.6 mph speed in reverse may aid the government's case more than plaintiff's case.

### Testimony about the Video Footage

Defendants further object to Gardner's opinion regarding the video footage. Gardner testified at his deposition about what he believes the video footage depicts. For example, he testified that he believed a particular individual seen in the footage is Special Agent David Hall, who was carrying an SL-6 (or baton gun). However, when pressed about how he made that determination, Gardner admitted he did not know what a baton gun looks like and that he could not say with certainty that the person was Hall. Gardner also testified that we cannot tell if all the agents are captured in the video footage, but later testified that there were not any ATF agents behind the suspects' car when shots were fired.

The Court agrees that Gardner's statements about what the video shows are undermine by conflicting statements in his own deposition. The jury will be able to view the video footage and make those determinations for themselves.

### Testimony about the Video Quality and Methods

Gardener commented in his report and in his deposition about the quality of the video footage and about how the ATF's methods for recording were "extraordinarily odd" and that there were better, easier ways to record such events. He also commented that he could not think of a reason why the repeated frames occurred in the video recordings. Defendants object because they state that Gardner insinuates, and will suggest to the jury, that there is something suspicious about the video footage.

This Court already granted defendants' motion to strike Gardner's testimony regarding the video footage irregularities (#49). The Court will exclude any such testimony from trial as well.

## V. Conclusion

The plaintiff's motion to reconsider motion for sanctions (#78) is denied, but plaintiffs may argue an inference that the missing parts of the videos would be detrimental to the defendants at trial. Defendant Hansen's motion for summary judgment is granted with respect to plaintiff's individual capacity *Bivens* claim and plaintiff's substantive due process claim. Defendant Hansen's motion for summary judgment on the excessive force claim is denied, and the government's motion for summary judgment is denied. Defendants' motion to exclude plaintiff's expert witnesses is granted in part as provided above.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment (#50, #52) are **DENIED in part** and **GRANTED in part.**

**IT IS FURTHER ORDERED** that plaintiff's motion for sanctions (#78) is **DENIED**.

**IT IS FINALLY ORDERED** that defendants' motion to exclude plaintiff's expert testimony (#54) is **GRANTED** in part as described above.

Dated this __16th__ day of May, 2018.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE