**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HOPE ANGELIC WHITE, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:15CV1252 SNLJ |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |

## MEMORANDUM AND ORDER

Plaintiff Hope Angelic White brings this action individually and in her capacity as personal representative for the Estate of her decedent, Myron Pollard, against defendants the United States of America and Bernard Hansen, an agent with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). The litigation pertained to defendant Hansen's fatal shooting of Pollard on August 29, 2012. Plaintiff, as personal representative of the estate of Pollard, brought a claim under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for the use of excessive force against Pollard, which was tried before a jury July 23-27, 2018. The jury found in favor of defendant. Plaintiff also presented a claim under the Federal Tort Claims Act ("FTCA") for wrongful death, which was tried simultaneously before this Court. The parties submitted proposed findings of fact and conclusions of law on plaintiff's FTCA claim on December 10, 2018.

Having considered the pleadings, trial testimony, exhibits, and proposed findings of facts and conclusions of law submitted by the parties, the Court hereby makes and enters the following findings of fact and conclusions of law with regard to Count I against the United States and in accordance with Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### Stipulated Facts

1.      This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., arising out of the death of Myron Pollard as a result of an officer-involved shooting that occurred during an undercover arrest in St. Louis, Missouri on August 29, 2012.

2.      Plaintiff Hope Angelic White resides St. Louis, Missouri and is the mother of Myron Pollard.

3.      Myron Pollard, a citizen of the United States of America, was an individual who resided in St. Louis, Missouri.

4.      Plaintiff Hope Angelic White is the duly appointed personal representative of the Estate of Myron Pollard, deceased, in the Probate Division of the Circuit Court of the City of St. Louis.

5.      On August 29, 2012, Defendant Bernard Hansen was employed by the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives as a Special Agent.

6.      On August 29, 2012, Defendant Bernard Hansen was acting in the course and scope of his employment as a Special Agent for the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives.

7.    On August 29, 2012, Defendant Bernard Hansen was acting under color of federal law.

8.    At all times relevant, Myron Pollard was a passenger sitting in the front passenger seat of a car that was being driven by Damitrius Creighton.

9.    Defendant Bernard Hansen fired three shots from his ATF-assigned rifle; one of these shots struck Myron Pollard in the head and fatally wounded him.

10.    Special Agent David Hall fired three baton rounds from his ATF-assigned less lethal SL-6 weapon.

11.    Myron Pollard was pronounced dead on August 30, 2012 at 2:06 a.m. as a result of a fatal gunshot wound to his head.

**Events Leading up to August 29, 2012**

12.    In mid-August of 2012, a reliable confidential informant contacted ATF special agent ("SA") Chris Wiegner about a suspect named Arlando Quarles who was believed to be committing violent crimes around St. Louis.

13.    After receiving this information from Quarles, the ATF agent arranged a meeting between SA Toby Gettler (who was working in an undercover capacity), the confidential informant, and Quarles. During this meeting, SA Gettler posed as a disgruntled narcotics courier who wanted to rob a drug stash house.

14.    SA Gettler met with Quarles and other suspects on three more occasions to confirm that they were willing to commit the fictitious robbery. During one of the meetings, Quarles and another suspect told SA Gettler that they planned to kill the occupants inside the drug stash house during the armed robbery.

15.     Through the confidential informant, SA Wiegner learned that the suspects also planned to kill SA Gettler and take his share of the drugs after the fictitious robbery.

16.     SA Wiegner requested the assistance of ATF's Special Response Team ("SRT") with the arrest of the suspects because the SRT members had more training in arresting suspects during the course of home invasion robbery operations and had access to more gear and weapons than the regular ATF field agents.

17.     SRT is similar to a Special Weapons and Tactics ("SWAT") team; the SRT members train to assist the field agents with high-risk events, like arrests at the conclusion of home invasion operations such as this one.

18.     In August 2012, SA Hansen was a full-time SRT member.

19.     About a week before the operation, SA Hansen and other SRT members were asked to assist with the arrest portion of this operation.

20.     After consulting with SRT, SA Gettler and SA Wiegner scheduled the final meeting with the suspects (*i.e.*, the arrest) to occur on August 29, 2012.

21.     Pollard was not known to the ATF agents, including SA Hansen, prior to August 29, 2012.

**August 29, 2012**

22.     SA Wiegner held a pre-operational briefing for the SRT and provided them with background information about the case and the operational plan, which usually includes a discussion of the tactical plan and how the takedown would occur, personnel assignments and contingencies, the use of force policies, and emergency driving policies.

23. The briefing occurred at approximately 8:00 a.m. on August 29, 2012 and was the first time that SA Hansen was briefed about the investigation.

24. During the briefing, SA Hansen learned that the suspects were supposed to bring firearms to the final stage of the undercover operation and that the undercover agent had received information that the suspects were planning to kill him following the robbery.

25. SA Wiegner believed that SRT needed to know that the suspects told the confidential informant that they were going to murder the undercover agent and the people in the stash house because it heightened the agents' awareness of the likelihood that guns would be present during the arrest.

26. SA Hansen testified that home invasions are one of the most high-risk operations with which SRT assists. Once SA Hansen learned that the suspects planned to kill the undercover agent, that raised the risk in his opinion.

27. SA Wiegner testified that in his experience, it is common for unknown suspects to show up on the day of the operation. In order to plan for this, they have several contingencies in place, such as blocking vehicles and less-lethal options, but SA Wiegner acknowledged that, "we can only plan for so much and can't anticipate everything that [the suspects] do."

28. The plan for the final meeting was to have SA Gettler drive a U-Haul truck, with the SRT members secreted in the back, into a parking lot to meet the suspects, confirm their willingness to commit the armed robbery, and then arrest the suspects.

29.     During the briefing, SA Hansen and the other SRT members discussed the possibility of the suspects' car reversing at them; however, they could not plan for when the driver would "hit the gas" and would have to figure out their reactions "on the fly." SA Hansen explained that in general they "discuss the various variables and [] train to various variables when they occur," but as far as "every minute-second detail when it's going to go, you can't practice that, per se."

30.     The morning of the briefing, the SRT also did a test run or rehearsal of the arrest in the parking lot of a hotel, with the goal of "ensuring that the back of the U-Haul gate was able to get manipulated in a proper manner so the team wouldn't get stuck inside."

31.     SRT could not run the rehearsal in the parking lot where the arrest was scheduled to occur, however, because the parking lot "was in close proximity to Mr. Quarles." SA Justin Meyer, the SRT Team Leader, testified that Quarles or other individuals could have seen them during the rehearsals, which would have compromised the investigation.

32.     For this operation, SA Hansen was assigned to be the number one arrest team person, meaning that he was the first SRT member to jump out of the back of the U-Haul.

33.     SA Hansen explained that the first SRT member out of the "stack" is responsible for identifying the threats, announcing "Police," getting to his predetermined position while engaging the suspects, and providing protection for the other SRT members who are "jumping out blind."

34.     SA Hansen described the other SRT members as jumping out of the U-Haul blind because of the U-Haul's position. When they exited, they would have to turn to their left to see the suspects' car, orientate themselves, and move into their predetermined positions.

35.     Immediately upon jumping out, SA Hansen's plan was to announce their presence and move across the rear of the suspects' car so he could see its passenger side.

36.     If everything had gone according to the plan, the SRT members would have formed an L-shape allowing them to cover both the white van and the suspects' car.

37.     After the pre-operational briefing, SA Gettler drove the U-Haul to the arrest location, with SA Hansen and seven or eight other ATF agents in the back.

38.     SA Gettler parked the U-Haul in the parking lot. There was also a white van parked in the lot, which SA Gettler had told the suspects that he was providing to them to conduct the robbery.

39.     The white van was parked perpendicular to a wall and there was an empty space to its right, which the agents assumed was where the suspects would park their car when they arrived.

40.     While waiting in the back of the U-Haul, SA Hansen heard over his earpiece that two suspects had arrived on foot and then that a dark sedan, which was occupied by multiple people, arrived in the parking lot and had pulled in next to the white van.

41.    While in the back of the U-Haul, SA Hansen could not see outside into the parking lot and did not know exactly where all the suspects were located, though he had an idea of their positions based on the pre-operational briefing.

42.    SA Gettler confirmed that each person inside the suspects' car was ready to commit the robbery and then faked a telephone call, which was the "bust signal" indicating that the SA Meyer should direct the SRT members to deploy from the U-Haul and arrest the suspects.

43.    After hearing the command "Initiate, Initiate, Initiate" over his earpiece, SA Hansen jumped out of the U-Haul and yelled multiple times something to the effect of, "Police. Let me see your hands."

44.    As the diversionary flashbang devices deployed, SA Hansen was heading to his pre-deployment position off the back of the U-Haul.

45.    SA Hansen estimated that it took him "three-some seconds or approximately a couple seconds" to get to the point where he saw the lights on back of the suspects' car turn on.

46.    The first time that SA Hansen saw the suspects' car was when he jumped out of the U-Haul.

47.    50. At that time, the suspects' car was parked with its front end pointed toward the wall, approximately 21 feet, or 7 yards, from SA Hansen.

48.    SA Hansen heard the engine rev and then he saw the reverse lights turn on.

49.    SA Hansen testified that he "remember[s] very vividly" that he said to himself something to the effect of "oh, f**k me, no" because he knew what was going to

happen next. He thought that he or the SRT members "were going to get run over" by the suspects' car.

50.     SA Hansen thought the suspects' car was going to run over them because they were in close proximity to the suspects' car and the car had to move backward in order to get out of the parking spot.

51.     When SA Hansen saw that the suspects' car was reversing, he "felt like [the driver] had slammed on the gas and the vehicle was coming at [him] like as fast as it would go."

52.     SA Hansen described everything as happening instantaneously. He testified that, "I mean, I'm running, I'm going, and then it's like, oh no, the lights are coming on. You know what's going to happen next. You are praying the car doesn't come. The car comes. I bring my rifle up, I take it off of safe, and I make the decision to engage the individual who is manipulating the vehicle."

53.     SA Hansen estimated that the suspects' car was reversing at 15-20 miles per hour.

54.     When SA Hansen first perceived that the suspects' car was reversing, it appeared to be "coming straight back from its parking spot."

55.     When SA Hansen decided to fire at the suspects' car, he did not know where it was going, he did not know it was going to turn, and he did not know that the bucket truck was going to disable the suspects' car.

56.     SA Hansen testified that the suspects' car eventually veered right.

57.     When SA Hansen fired the shots, the suspects' car was reversing and turning.

58.     SA Hansen testified that after he fired the three shots, he did not know what they hit. However, with the last shot he ended up on the driver's side of the suspects' car and fired through the side of the car.

59.     SA Hansen admitted that, in hindsight, if he had run away from the suspects' car toward the U-Haul, he would not have been hit, but at the time he decided to fire the shots, he did not know that he could step out of the way of the suspects' car.

60.     In addition, SA Hansen did not feel that running away was an option because it was his job to try to arrest the suspects and it was his responsibility to protect the other SRT members who "were running into the same stuff blind."

61.     Although SA Hansen did not know exactly where the other SRT members were positioned when he fired the shots, he believed they were going to line up as they had discussed during the pre-operational briefing.

62.     SA Hansen was worried about his teammates' safety because "they were going to be in the way of the vehicle" and "didn't know what they were getting into."

63.     With regard to whether he had a target and could see his target, SA Hansen testified that he had a target because he knows where the driver sits in a car and he was trying to stop the manipulation of the car so that it could not be used as a weapon.

64.     When SA Hansen fired at Creighton, he was not trying to kill him; his intention was to stop him from using the car as a weapon.

65.     SA Hansen testified that he did not fire any shots before the suspects' car started moving or after it stopped moving. He fired all three shots before the bucket truck hit the suspects' car.

66.     After watching and listening to the videos multiple times, SA Hansen testified that he did not hear any gunshots after the crash. He only heard three shots before the crash.

67.     After watching and listening to the video from the undercover agent's body camera, SA Hansen testified that he heard the following occur: the U-Haul door comes up, he yells 'Police," the flashbangs deploy, three gunshots, the crash, and then the SRT members engaging the suspects.

68.     No more than four seconds elapsed between the time the suspects' car started reversing and the collision with the bucket truck.

69.     At the time of the crash, SA Hansen was standing as depicted in the still photograph from the pole camera.

70.     SA Hansen did not weigh any other options in his head before deciding to fire because he "didn't have time to think anything else." He testified that if he had felt that he had other options, he would have pursued them.

71.     SA Hansen testified that despite all the planning and training, the one thing he could not control was how the suspects reacted to SRT's attempt to arrest them. He explained that the suspects "get a vote in how the situation plays out once we announce ourselves."

72.     According to SA Wiegner, several things occurred during the undercover operation that did not go exactly according to plan. For example, unknown suspects showed up on the day of the operation and SRT did not anticipate that Creighton was going to attempt to evade arrest and refuse to comply with the commands given by SRT.

73.     SA Hansen testified that to this day he is still shocked that ATF SA Tomaszewki was able to drive the bucket truck so fast into the parking lot and stop the suspects' car.

74.     There is no evidence of bad faith or malice by Hansen.

75.     Nine other ATF agents were armed with semi-automatic rifles at the time and place of the incident.

76.     SA David Hall, who was also secreted in the back of the U-Haul with Hansen, was assigned to carry the SL-6 less-lethal weapon, which is also referred to as a baton rifle, as his primary weapon. SA Hall also had a .40 caliber pistol in his holster.

77.     SA Hall testified that he exited the U-Haul, turned to his left and saw the suspects' car coming their direction. He fired a baton round at the rear window on the driver's side and tried to move out of the way. There were other SRT members to his right and left and he "was confident that the car was going to hit the agents to [his] right." Hall stepped to his left and backward. He fired a second baton round at the driver's side window and as the suspects' car "slid by," he fired a third round at the windshield at the driver.

78.     SA Hall fired all three baton rounds at the suspects' car before it collided with the bucket truck.

79.     SA Hall described that suspects' car as "coming directly at us very rapidly in reverse."

80.     SA Hall described his decision to fire his weapon as "pretty instinctive" and stated that he was trying to stop the car by stopping the driver.

81.     With regard to the timing of the events, SA Hall testified that, "It happened so quickly and so rapidly and very simultaneous to all of us getting out of the vehicle that there wasn't a lot of time to process – it was purely, you know, reactionary on my part."

82.     SA Hall testified that he did not have time to fire his pistol, which was holstered, and that he reacted with the weapon that he had, which was the SL-6.

83.     SA Hall testified that if he had been carrying an M4 rifle as his primary weapon, instead of the SL-6, his "actions would have been identical." He said, "I didn't have time to react. And I felt the car was a lethal threat, and I would have done exactly the same thing; I would have shot at the driver."

84.     SA Hall is a credible witness.

85.     SA Hall's testimony corroborates Hansen's version of events.

86.     Matt Bodnar, an independent eyewitness, was standing approximately 150 yards away while treating a nearby house for termites when he heard two to three flashbangs, followed by three to six gunshots, and then a car crash.

87.     After he heard the crash, Bodnar did not hear any more shots.

88.     The flashbangs caused Bodnar to look and see a Silver Grand Prix "moving out of [his] peripheral," which caught his attention. He saw the car reverse for "three seconds maybe" before it struck a utility truck.

13

89.     Bodnar did not see the car when it was parked, nor did he see it move from its parked position. When he saw the car, it was reversing and "[i]t was always curving when [he] saw it."

90.     Bodnar characterized the car as driving "slow, maybe 15 to 20 miles per hour."

91.     Bodnar is a credible witness.

92.     Bodnar's testimony corroborates SA Hansen's testimony about the sequence of events that occurred between the deployment of the flashbangs and the collision.

93.     SA Justin Meyer, who was sitting in a surveillance vehicle outside of the parking lot, did not see the shooting occur. However, he testified that after giving the "initiate" signal, he heard the flash bangs go off, a vehicle moving, gunshots, and then a car crash.

94.     Once SA Meyer exited the surveillance vehicle and entered the parking lot, he saw SA Hansen. Based on SA Hansen's "visual" cues, SA Meyer knew that SA Hansen had been involved in "some type of incident."

95.     SA Meyer described SA Hansen as looking "withdrawn, like he had just been through a critical incident."

96.     SA Meyer testified that SA Tomaszewski, who was driving the bucket truck, was originally assigned to block the parking lot's exit, but he made the decision to "change his primary location and where he needed to be in order to be more advantageous to ensure that nobody left the immediate area."

97. As the SRT Team Leader, SA Meyer expects the SRT members to observe what is happening during the operation, which he described as fluid, and "make their decisions … in coordination with other agents as the actual situation is materializing."

98. SA Meyer is a credible witness.

99. SA Meyer's testimony about the sequence of events corroborates SA Hansen's testimony.

100. Mark Ezra, a mechanical engineer, testified as an expert witness for the Plaintiff. He performs accident reconstructions, which includes calculating speeds, distances, and directions of vehicles.

101. Using the video footage from the pole camera and one of the remote cameras, Ezra calculated the distance, time, and speed of the suspects' car.

102. Ezra created a diagram that depicts the path that the suspects' car traveled from its parked position until it collided with the bucket truck. He testified that this is the only possible path, within a few inches plus or minus, that the car could have taken based on the laws of physics given the fact that there is video footage depicting the car's starting point and stopping point.

103. Ezra calculated that the suspects' car traveled 44 feet in 3.4 seconds, which means that its final speed (speed at the time of impact), was 17.65 miles per hour.

104. Ezra calculated that after traveling one car length (16 feet), the suspects' car would have been traveling 10.76 miles per hour.

105. Ezra calculated that after traveling a second car length, the suspects' car would have been traveling 15.23 miles per hour.

106.    The suspects' car collided with the bucket truck before it traveled a full third car length and was travelling 17.65 miles per hour at the time of the collision.

107.    In total, the suspects' car traveled approximately 2.6 car lengths before the impact.

108.    On cross-examination, Ezra acknowledged that, "the perspective is so skewed from the camera" that was setup under the tractor-trailer.

109.    With regard to the video footage in Trial Exhibit 29-C, Ezra stated that, "you cannot tell where people are because of the angle because of parallax."

110.    Ezra acknowledged that the suspects' car pulled into the parking spot following a slightly different path than it used to pull out and that the suspects' car reversed out of the parking spot three times faster than when it pulled into the spot.

111.    Ezra explained that it is "generally accepted in accident reconstruction that the quickest you can react to an unexpected situation is one and a half seconds. Perception time is three quarters, reaction time to begin to do whatever you have decided is another three quarters of a second; so it's one and a half seconds…."

112.    For expected events, Ezra testified that, "accident reconstruction books say" that it takes half a second to react when "you are just waiting for the event to occur and then do something."

113.    Ezra provided an example of an expected event. He testified that, "… if you have a light on the wall and I say look at it and hit the button when it comes on," it will generally take the person about half a second to hit the button.

114.    Ezra estimated that it would take 2.3 seconds for a car driving an average speed of 6 miles per hour to travel 21 feet.

115.    Ezra's testimony does not disprove any of Hansen's statements about what he heard and saw prior to firing his weapon.

116.    Ezra's testimony also does not suggest that Hansen's decision to fire was unreasonable.

117.    According to Ezra's testimony, the quickest that Hansen could react to that movement of the suspect's car was one and a half seconds. Had the suspects' car continued to reverse backward at the agents, who were standing approximately 21 feet away, instead of turning, the car would have hit Hansen and the other SRT agents less than one second later.

118.    Ezra's testimony supports Hansen's and Hall's claim that they had only a moment to decide how to react to the reversing car.

119.    The fact that the suspects' car ultimately turned to the right does not render Hansen's decision to fire unreasonable because he made the decision to fire before the car began turning and he stopped firing once he believed the car ceased being a deadly threat to himself and the other agents.

120.    Alexander Jason, the Defendant's expert, is a certified senior crime scene analyst, who specializes in reconstruction and analysis of shooting incidents.

121.    Jason is also a trained blood spatter analyst.

122.    After examining a photograph of the side of the suspects' car, which showed blood spatter on the trunk lid, Jason concluded that when the collision occurred,

Pollard's head snapped back, which projected blood from the entry wound on the left side of his head out onto the trunk.

123.     Jason testified that all the other photographs of the blood spatter are consistent with Pollard's "head snapping back [] just as the window is blown out and … project[ing] the blood out the back."

124.     Jason testified that if the car had been stationary when Pollard was fatally shot, the blood could not have projected that far back onto the trunk.

125.     Jason testified that the blood spatter on the trunk could not have come from the backseat passenger's wound to his hand and thigh because "the elongated tails of the blood spatter [] indicate that they came in at essentially an angle parallel to the ground …."

126.     Based on the castoff blood spatter on the trunk, Jason concluded that the fatal shot occurred before the crash.

127.     In addition, Jason testified that it is his opinion that the driver's side window glass was intact when the fatal bullet struck Pollard. Jason based this opinion on the size and shape of the entry wound on Pollard's head, which indicated that the fatal bullet had hit something else first and was in yaw when it struck Pollard.

128.     Jason testified that if the fatal shot had, instead, been fired through an open window and struck Pollard, there would have been a round hole in the side of his head.

129.     Jason testified that at least two of the bullets from Hansen's rifle traveled through the rear driver's side window. He testified that the defect marked as "A" in photographs of the driver's side rear window (Trial Exhibits G-2, G-3, and G-5) is a

bullet impact mark based on the fact that there was some missing paint and that there was an area "raised up a bit from the metal being distorted by the bullet pushing into it." He also testified that a photograph of the tint and window glass on the ground after the collision showed "what appears to be a bullet hole right in the center of the window" and "that would have occurred before the window was blown out of the car."

130.     Jason testified that he believes that the impact with the bucket truck caused the windows to be blown out, which is common in collisions like this one.

131.     Jason testified that that "it's more likely that [Pollard] was shot from a bullet that went through defect A or through the red mark [he] made in the middle of the … the rear passenger window" on the driver's side.

132.     Jason testified that there is nothing in the photographs of the physical evidence that is inconsistent with SA Hansen's description of what occurred.

133.     Jason is a credible witness.

134.     Jason's testimony corroborates SA Hansen's testimony that he fired the fatal shot before the suspects' car collided with the bucket truck.

135.     Damitrius Creighton drove the silver 1999 Grand Prix into the parking lot and pulled into a parking space as depicted in the pole camera video footage, which was marked as Trial Exhibit 29-D.

136.     Creighton testified that a person he did not know or recognize walked up to the car, opened the door, and "said something about, 'Are you ready to get these keys,'" which meant kilos.

137.    Creighton testified that in response he "nonchalantly said, 'yeah, whatever,' like to get him away from me."

138.    Creighton testified that the unknown person (who he now knows was an undercover agent) stepped away from the car and Creighton closed the door and he heard a door lift up, then a "real, real loud explosion," and then people yelling, "police, police."

139.    On cross-examination, after looking at the still shot from the pole camera, Creighton admitted that his car door was open while the U-Haul door was open.

140.    Creighton testified that he "kind of froze up" and then revved the engine. Then, Pollard leaned over and put the car in reverse.

141.    On cross-examination, Creighton testified that after the flashbangs went off, he put his hand in the air.

142.    Pollard was telling Creighton to, "go, go, get out of here, go."

143.    After Pollard put the car in reverse, Creighton "pressed on the gas," "almost to the floor."

144.    Creighton testified that he smashed on the gas in reverse and was trying to get out of the parking lot.

145.    Creighton testified that he did not look in the rear-view mirror and did not look in the side-view mirrors.

146.    Once Creighton backed up and started going toward the exit, he looked over his right shoulder and saw "the grille of a real big truck behind [him], coming behind [him]."

147.    Creighton did not see where Hansen was standing when he was reversing.

148.     Creighton heard gunshots while his car was moving.

149.     Creighton testified that he believes that the rubber bullets knocked out the rear driver's side window and the front driver's side window and damaged the windshield before the collision.

150.     Creighton testified that Pollard was alive before the collision with the bucket truck and he knows this because he was looking at Pollard.

151.     Creighton also testified that he hit his head hard on the steering wheel when his car crashed into the bucket truck.

152.     After Creighton got out of the car, he passed out. He was later diagnosed with concussive-like symptoms.

153.     Creighton testified that he heard three gunshots after he hit the bucket truck and then blood splattered on his face.

154.     Creighton testified that the gunshots flew behind his head while he was "up against the steering wheel."

155.     Creighton testified that Pollard was getting up off the floor and that when the bullet hit Pollard, it knocked him all the way back into his seat.

156.     After watching the video that was marked as Trial Exhibit 29-C, Creighton testified that he heard four or five gunshots after the collision with the bucket truck.

157.     Creighton is a three-time convicted felon.

158.     Creighton pleaded guilty to conspiracy to commit a Hobbs Act robbery, possession of a firearm in furtherance of a violent crime, and a felony in state court.

159.    Creighton admitted that he lied during his guilty plea hearing and sentencing hearing for those crimes.

160.    During his guilty plea hearing, Creighton agreed that Pollard was a willing part of the agreement and plan to rob the Mexican drug dealers. However, on cross-examination at trial, Creighton admitted that this statement was not true, that he knew it was not true when he said it, and that he lied to the judge.

161.    During his guilty plea hearing, Creighton agreed that the undercover agent leaned into his car and asked if they were ready to do the robbery and they all agreed. However, on cross examination at trial, Creighton admitted that this statement was not true and that he was lying to the judge when he said it was true during his guilty plea hearing.

162.    During his guilty plea hearing, Creighton agreed that he backed the Grand Prix in the direction of the SRT agents at a high rate of speed. However, on cross-examination at trial, Creighton testified that he was lying when he told the judge that he backed the Grand Prix in the direction of the SRT agents at a high rate of speed.

163.    Creighton also admitted that he lied during his guilty plea hearing when he said that he read his plea agreement and that everything in it was true.

164.    Creighton agreed that he was placed under oath and that he swore to tell the truth during his guilty plea hearing.

165.    Creighton testified that he lied during his guilty plea hearing so he could benefit himself.

166.     Creighton's admissions that he previously lied under oath demonstrate a disregard for the truth and undermine his credibility.

167.     Furthermore, Creighton's testimony is inconsistent with Jason's expert opinion that the fatal shot occurred before the collision, which he based upon the blood spatter contained on the trunk of the car.

168.     Creighton's testimony is also inconsistent Jason's expert opinion that the car's windows were intact before the collision and the fatal shot went through the rear driver's side window. Jason explained that this opinion is based upon the physical evidence, including the size and shape of the wound to Pollard's head.

169.     Jason's expert opinions renders Creighton's version of events physically impossible.

170.     Creighton is not a credible witness.

171.     Several videos set up by the ATF recorded different perspectives of the incident.

172.     A "pole camera" recorded the events from a high corner of the parking lot, but it does not include audio, and the recording rate was slow, so it includes irregularly timed video that misses frames of the actual shooting.

173.     A recording taken from the dashboard of an ATF vehicle in the alley does not show the shooting, and the audio on that recording stops just after tires squeal and before the crash occurs.

174.     A video and audio recording taken from underneath a tractor trailer near the undercover agent's minivan includes an incomplete view of the incident but shows SRT

members coming into frame and the suspects' vehicle backing up. Audio from this recording includes the detonation of the flashbang device, three gunshots, tires squealing, and the crash. The noise from the crash goes on for some time in an apparent reverberation.

175. Although plaintiff maintains that there were three shots fired after the crash, it is more likely than not that the perceived shots were actually reverberations from the crash.

176. All in all, the video and audio records do not support that shots were fired after the crash.

## CONCLUSIONS OF LAW

The FTCA permits lawsuits against the United States for "negligent or wrongful acts by federal employees committed while acting within the scope of their employment." *Washington v. Drug Enforcement Admin.*, 183 F.3d 868, 873 (8th Cir. 1999) (citing 28 U.S.C. § 1346(b)). The United States may be held liable "to the same extent that a private person under like circumstances would be liable to the claimant in accordance with the law of the state where the wrongful conduct took place." *Id.* At the same time, the FTCA permits the United States to "assert any defense based upon judicial or legislative immunity which otherwise would have been available to the [federal] employee…whose act or omission gave rise to the claim." 28 U.S.C. § 2674.

The Court looks to state law to determine "the extent of the United States'[s] liability under the FTCA." *Mader v. United States*, 654 F.3d 794, 797 (8th Cir. 2011). Plaintiff's FTCA claim here is based on Missouri's wrongful death statute. § 537.080

RSMo. Missouri's wrongful death statute permits the defendant to assert any defense that it would have had against the deceased had he survived. § 537.085 RSMo. Hope White is a member of the class of persons entitled to bring this wrongful death action under § 537.080 RSMo. "When determining the scope of Missouri law, [the Court is] bound by the decisions of the Supreme Court of Missouri." *Eubank v. Kansas City Power & Light Co.*, 626 F.3d 424, 427 (8th Cir. 2010). "If the Supreme Court of Missouri has not addressed an issue, [the Court] must predict how the court would rule, and [the Court should] follow decisions from the intermediate state courts when they are the best evidence of Missouri law." *Id.* Plaintiff must prove her case by a preponderance of the evidence. *See Miller v. Watkins*, 355 S.W.2d 1, 2 (Mo. 1962).

Plaintiff does not clearly articulate whether she seeks to proceed under a negligence theory or intentional tort. The Court will address both.

## I.     Negligence

To prove that defendant negligently caused the death of Pollard, "the plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W. 3d 151, 155 (Mo. *banc* 2000).

Defendant first contends that he was under no duty to protect the decedent and that, as a result, defendant is entitled to judgment. "Whether a duty exists in a given situation depends upon whether a risk was foreseeable." *Id.* at 156. "In the absence of a particular relationship recognized by law to create a duty, the concept of foreseeability is

paramount in determining whether a duty exists." *Id.* Notwithstanding the "foreseeability" test, however, the "public duty doctrine" protects public employees from civil liability for the breach of a duty owed to the general public, as opposed to a duty owed to an individual. *Southers v. City of Farmington*, 263 S.W.3d 603, 611 (Mo. *banc* 2008). The public duty doctrine "negates the duty element required to prove negligence, such that there can be no cause of action for injuries sustained as the result of an alleged breach of public duty to the community as a whole." *Id.* Here, defendant argues that the doctrine applies because "[e]nforcement of the law and keeping of the peace are duties which a municipality and its employees owe to the general public but a breach of which is not actionable by a citizen." *Berger v. City of University City*, 676 S.W.2d 39, 41 (Mo. App. E.D. 1984); *see also Parker v. Sherman*, 456 S.W.2d 577, 580 (Mo. 1970).

Although plaintiff—who did not address the public duty doctrine—suggests that defendant had a duty to safeguard the passengers in Creighton's car, the Court finds this situation is one to which the public duty doctrine applies. The Missouri Supreme Court has held that the public duty doctrine protected police officers who unintentionally shot bystanders during an arrest and that the police officers did not owe a duty to the individuals who were hit by stray bullets. 738 S.W.2d 861, 867 (Mo. banc 1987), *abrogated on other grounds by Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 766 (Mo. *banc* 2006). Similarly, intermediate appellate courts in Missouri have held that police officers only owe a duty to the general public and do not owe a duty to individual suspects or citizens. *See Jackson v. City of Wentzville*, 844 S.W.2d 585, 587 (Mo. App. E.D. 1993), *abrogated on other grounds by Southers*, 263 S.W.3d at 613-14 (police

officer's duty to prevent an intoxicated person from driving is owed to the general public, not to individual who was hit by intoxicated driver); *Cooper v. Planthold*, 857 S.W.2d 477, 480 (Mo. App. E.D. 1993) (requirement that police departments maintain safe jail cells is a duty owed to the general public, not to a particular individual); *Norton v. Smith*, 782 S.W.2d 775, 778 (Mo. App. E.D. 1989) (parole officer's duty to report parole violations or to issue arrest warrants was owed to the public, not to an individual who was shot by a man who violated parole); *Throneberry v. Mo. State Highway Patrol*, 526 S.W.3d 198, 206 (Mo. App. W.D. 2017) (highway patrol officer did not owe a duty of care to motorist who was killed in a collision by a fleeing suspect during police pursuit).

Critically, the evidence showed that defendant intended to shoot at the driver of the suspects' car, not at Pollard. The above cases related to bystanders' injuries are thus relevant to the Court's inquiry. Defendant's shooting into Creighton's car arose from his duties owed to the public generally, and defendant did not owe a duty to Pollard. The public duty doctrine thus bars plaintiff's negligence claim against the United States.

Even if defendant had owed a duty to Pollard, plaintiff did not show that he breached that duty when he shot at Creighton in an attempt to stop Creighton from using the car as a deadly weapon.

Missouri law provides protections to police officers who use deadly force to prevent serious physical injury to themselves and others. Pursuant to § 563.046, a police officer may use deadly force if he "reasonably believes that such use of deadly force is immediately necessary to effect the arrest … and also reasonably believes that the person to be arrested: may otherwise endanger life or inflict serious physical injury to the officer

or others unless arrested without delay." § 563.046.3(2)(c) RSMo; *Fitzgerald v. Patrick*, 927 F.2d 1037, 1038-39 (8th Cir. 1991). ATF Special Agents have the power to make arrests, carry firearms, and serve warrants and subpoenas in accordance with 18 U.S.C. § 3051(a); and therefore, are considered to be police officers within this definition. Further, Missouri law also permits any person, whether a law enforcement officer or not, to use deadly force if he "reasonably believes that such deadly force is necessary to protect himself…or another against death, serious physical injury, or any forcible felony." § 563.031.2 RSMo.

The standard for the use of deadly force under Missouri law is the same as that required by the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 16 n.14 (1985) (noting that Missouri codified the common-law rule by enacting § 563.046 RSMo). Federal courts agree that, "[i]f a suspect attempts to run over an officer with an automobile, that automobile becomes a deadly weapon." *See Beasley v. Piekutowski*, No. 4:02CV00823ERW, 2005 WL 1463485, at *7 (E.D. Mo. June 21, 2005); *see also Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)). The phrase "reasonably believe" "means a belief based on reasonable grounds, that is, grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false." *State v. Smith*, 456 S.W.3d 849, 852 (Mo. *banc* 2015) (internal quotations omitted). "A person who uses force as described in sections 563.031… [and] 563.046… is justified in using such force and such fact shall be an absolute defense to … civil liability." § 563.074.1 RSMo. Notably, the Eighth Circuit has held that shootings under similar circumstances

were reasonable under the Fourth Amendment. *See Sanders v. City of Minneapolis, Minnesota*, 474 F.3d 523, 526 (8th Cir. 2007); *Hernandez v. Jarman*, 340 F.3d 617, 623-24 (8th Cir. 2003); *Molina-Gomes v. Wellinski*, 676 F.3d 1149, 1152-53 (8th Cir. 2012).

Prior to the shooting, defendant Hansen knew that the arrest would be high risk based on the information he received that the suspects would be armed and were planning to kill the undercover officer and the occupants of the fictitious stash house. Defendant stated that he and the other arresting agents were jumping out of the U-Haul blind and had to turn their bodies in order to see the suspects. Within seconds of jumping out of the U-Haul, the suspects' car began reversing at Hansen and the other agents. The car ultimately turned, but the credible evidence supports the conclusion that the car appeared to be reversing directly at the agents when it first started reversing out of its parking spot. Furthermore, even plaintiff's expert testified that the car was traveling at over 15 miles per hour, which is quite fast in a confined space.

When the suspects' car first started moving, Hansen did not know that the suspects' car would turn. ATF agents' testimony, the video evidence, Jason's expert opinion, and Bodnar's testimony all support defendant Hansen's testimony that he fired each of the three shots before the collision, in response to a deadly threat. With only seconds to perceive and react to the car's sudden movement, a reasonable officer on the scene could have feared that he or his teammates were going to be hit or run over by the car. Although plaintiff points out that defendant was the only person to discharge a deadly weapon, Hansen was the first agent out of the U-Haul truck. He testified that he felt responsible for the safety of the other agents who were jumping out of the truck

"blind." Furthermore, SA Hall testified that he would have fired a deadly weapon if he had been holding one—instead, he fired his non-lethal weapon.

The Court holds that the preponderance of the evidence supports that defendant Hansen's use of deadly force was reasonable under the circumstances. Much of plaintiff's argument relates to her allegations that the videos of the scene were tampered with. The Court need not address those allegations because they have been addressed by the Court's earlier orders.

## II.     Intentional Tort

To the extent that White is alleging an intentional tort in Count I, as opposed to a negligence claim, the same analysis of the reasonableness of defendant Hansen's use of deadly force as discussed above applies to an assault and battery claim. "Under Missouri law, a law enforcement officer can be held liable for damages for assault and battery 'only when in the performance of his duty in making the arrest he uses more force than is reasonably necessary for its accomplishment.'" *Wright v. United States*, 892 F.3d 963, 967-68 (8th Cir. 2018) (citing *Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987)). For the same reasons discussed above, defendant Hansen's use of deadly force was reasonable. As a result, the United States is entitled to judgment in its favor.

Accordingly,

**IT IS HEREBY ORDERED** that judgment will be entered against plaintiff and in favor of defendant on plaintiff's FTCA claim.

Dated this __29th__ day of March, 2019.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE